# LIVE NATION

**LIVE NATION WORLDWIDE, INC. ("LN")**
**VENDOR SERVICES AGREEMENT**

*THESE TERMS AND CONDITIONS SHALL GOVERN THE RELATIONSHIP BETWEEN THE PARTIES HEREIN WITHOUT EXCEPTION UNLESS AGREED TO IN WRITING BY BOTH PARTIES*

THIS VENDOR SERVICES AGREEMENT ("Agreement") is effective as of March 15, 2013 ("Effective Date") by and between **ESG Security, Inc.** ("Vendor") and Live Nation Worldwide, Inc. ("LN"), sometimes referred to herein as "Party" or "Parties" with regard to the aforementioned and the following:

WHEREAS, LN is the owner or operator of places of public gathering commonly known as the **Louisville Palace** ("Venue") where it presents certain live entertainment concerts and other live events ("Event(s)");

WHEREAS, Vendor is in the business of providing crowd control and event guards at places of public gathering such as the Venue and desires to provide such services ("Services"), as defined in greater detail hereunder, to LN at the Venue;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, LN and Vendor hereby agree as follows:

**SCOPE OF VENDOR SERVICES OR DESCRIPTION OF VENDOR PRODUCTS:** Shall be set out in Exhibit "A" Form attached hereto and incorporated herein for all purposes.

1. **TERM & TERMINATION:**
   A. <u>TERM</u>: The term of this Agreement shall commence upon the Effective Date and shall continue up to and including March 14, 2015 ("Term"). Notwithstanding the foregoing, LN shall deem Vendor's performance of its obligations hereunder, to any extent, Vendor's acceptance of compensation hereunder and/or Vendor's execution of this Agreement to be acceptance of the terms and conditions of this Agreement.

   B. <u>TERMINATION</u>: Notwithstanding the foregoing:
      (i) LN shall have the right to terminate this Agreement in whole for any reason upon providing Vendor with thirty (30) days prior written notice of its intent to so terminate;
      (ii) Either Party may terminate this Agreement upon fifteen (15) days prior written notice if the other Party materially breaches its obligations under this Agreement and does not remedy or substantially begin to remedy such breach within ten (10) days of receiving the non-breaching Party's written notice of the alleged breach.

2. **COMPENSATION:**
   A. In consideration of the Services to be performed, the products to be provided and/or the rights granted herein, LN shall pay to Vendor according to the schedule in Exhibit "B" attached hereto and incorporated herein for all purposes.

   B. The fees in Exhibit "B" shall not be increased during the Term of this Agreement without LN'S written authorization, except as noted in Exhibit "B".

   C. The Vendor agrees and acknowledges that should Vendor offer a more favorable price to any of its clients that are similarly situated to LN with respect to geographical area, their service and/or product requirements, Vendor shall immediately inform LN of this fact and lower LN'S price to the same or lower price, such lower pricing to be made effective immediately and, if such pricing was in place prior to the Effective Date of this Agreement, the lower price shall be made retroactive to day one and Vendor shall reimburse LN for the difference within ten (10) business days. In furtherance of the foregoing, should Vendor fail to inform LN of the aforementioned favorable pricing and LN nonetheless becomes aware of such pricing before or after the Effective Date and informs Vendor, LN shall then have the right to either (i) terminate this Agreement effective immediately or (ii) demand reimbursement according to the above-referenced standards.

3. **INSURANCE:**
   A. Vendor shall maintain the following insurance coverage throughout the Term of this Agreement at Vendor's sole expense:

1

(i) Statutory Workers' Compensation including Employer's Liability Insurance, subject to limits of not less than Five Hundred Thousand Dollars ($500,000.00), affording coverage under the Workers Compensation laws of the State or Commonwealth in which the Services are performed;

(ii) Commercial General Liability Insurance for limits of not less than One Million Dollars ($1,000,000.00) per occurrence Bodily Injury and Property Damage combined; One Million Dollars ($1,000,000.00) per occurrence Personal and Advertising Injury; Two Million Dollars ($2,000,000.00) aggregate Products and Completed Operations Liability; Fifty Thousand Dollars ($50,000.00) Fire Legal Liability and Two Million Dollars ($2,000,000.00) general aggregate limit per policy. The policy shall be written on an occurrence basis. The policy shall cover assault and battery; the policy does not expressly exclude abuse and molestation;

(iii) Umbrella Liability Insurance at not less than Nine Million Dollars ($9,000,000.00) limit providing excess coverage over all limits and coverages noted in 3A (ii) above. This policy shall be written on an occurrence basis;

(iv) Comprehensive Automobile Liability Insurance containing a One Million Dollars ($1,000,000.00) combined single limit covering all owned, non-owned and hired vehicles. Policy shall be endorsed to name additional insureds as respects the operations of the named insured, its agents, contractors and employees; and

(v) Coverage for the additional insured shall apply on a primary basis irrespective of any other insurance, whether collectible or not.

B. The policies in 3(A) shall be endorsed to name Live Nation Worldwide, Inc. and each of its parents, partners, affiliates, subsidiaries, landlords, successors, and assigns (collectively, the "LN Parties") as Additional Insureds as respects the operations of the named insured, its agents, employees, representatives and contractors. Further, coverage naming the Additional Insureds shall be on a contractual liability basis irrespective of any other insurance, whether collectible or not, only to the extent of Vendor's liability as described in this Agreement. Upon execution of this Agreement and when insurance coverages are renewed, Vendor shall provide LN Certificates of Insurance evidencing the aforementioned required endorsements.

C. To the extent LN is leasing equipment from Vendor during the Term of this Agreement and if LN so agrees, upon written request from Vendor, LN will provide to Vendor a certificate of insurance evidencing LN'S applicable insurance coverages in amounts described in 3(A)(ii) above.

4. **INDEMNIFICATION:**

A. To the fullest extent permitted by law, Vendor expressly agrees to indemnify, defend and hold harmless LN Parties from and against any and all claims or loss arising out of any violation of any law, rule, regulation or order, and from any and all claims or liabilities, including reasonable attorney's fees, for loss, damage or injury to persons or property of whatever kind or nature arising from the acts or omissions of Vendor, its parents, partners, affiliates, subsidiaries, successors or assigns and each of their respective agents, employees, representatives and contractors.

B. To the fullest extent permitted by law, LN expressly agrees to indemnify, defend and hold harmless Vendor from and against any and all claims or loss arising out of any violation of any law, rule, regulation or order, and from any and all claims or liabilities, including reasonable attorney's fees, for loss, damage or injury to persons or property of whatever kind or nature arising directly from the sole negligence or willful misconduct of LN in performance of this Agreement.

C. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT.

D. Vendor shall indemnify LN for any claims brought against LN as a result of the conduct of one or more of Vendor's employees in violation of any state or federal law, including, but not limited to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, the Age Discrimination in Employment Act (which prohibits discrimination on the basis of age), the Older Workers Benefit Protection Act, the Workers' Adjustment and Retraining Notification Act, the ADA, and any other federal, state, or local law prohibiting age, race, color, gender, creed, religion, sexual preference/orientation, marital status, national origin, gender identity, mental or physical disability, veteran status, or any other form of unlawful discrimination or claims under any federal, state or local constitutions, statutes, rules or regulations or tortious conduct (whether intentional or otherwise) including but not limited to defamation and violations of public policy.

5. **REPRESENTATIONS AND WARRANTIES:**

A. Vendor warrants that any products or materials provided by it hereunder shall be (i) free from defects in workmanship and/or materials; (ii) be in compliance with all applicable laws relating to such products and (iii)

2

be fit for its intended purpose. Services shall be performed by Vendor in a good and a workmanlike manner. Vendor shall be fully licensed, certified and bonded as customary or required by LN or applicable law. Vendor agrees that any damage arising from any breach of this representation and warranty shall be promptly remedied by Vendor at its sole expense.

B. Vendor shall at all times comply with all applicable laws, codes, regulations and rules with respect to the work to be performed and the products, equipment or materials to be furnished to LN and any and all federal, state, municipal or other legislative bodies, courts or agencies having jurisdiction over the business of Vendor. Any licenses, permits and required recordkeeping shall be provided to LN during the Term of the Agreement and for a period of three (3) years after the expiration or termination of this Agreement upon written request by LN.

6. **INTELLECTUAL PROPERTY**: Each Party is, and shall remain, the owner of all rights it has in all creative and copyrightable material created by it, trademarks, service marks and other intellectual property as they may exist or may hereafter be modified by such Party (each Party's "Marks"). Each Party acknowledges that its use of the other Party's Marks inures to the benefit of the Party owning such Marks, including any goodwill, and that neither Party will acquire any ownership in the other Party's Marks as a result of this Agreement. Neither Party shall use the other Party's Marks or allow any other Party to use the other's Marks in any manner not specifically granted in writing by the owner of such Marks prior to use. If permission is so granted, then the Marks shall be used only in the format in accordance with the specifications provided by the Party granting such use from time to time, unless approval to modify the Mark(s) is expressly granted. All materials using a Party's Marks must be pre-approved by the Party owning such Marks.

7. **ASSIGNMENT**: This Agreement or any part hereof, may be assigned or transferred by LN to any person or entity which acquires ownership or management of the Venue. Neither this Agreement nor any part hereof shall be transferred, conveyed or assigned by Vendor without the prior written consent of LN.

8. **ENTIRE AGREEMENT**: This Agreement contains the entire Agreement between the Parties relating to the subject matter hereof and all prior Agreement relative hereto which are not contained herein are terminated. This Agreement may not be amended, revised or terminated orally but only by a written instrument executed by the Party against which enforcement of the amendment, revision or termination is asserted.

9. **RELATIONSHIP OF THE PARTIES**: Nothing herein contained shall create or be construed as creating a partnership, employment, joint venture or agency relationship between the Parties and no Party shall have the authority to bind the other in any respect.

10. **SUCCESSORS AND ASSIGNS**: All of the terms of this Agreement shall apply to, be binding upon and inure to the benefit of the Parties hereto, their successors, assigns, heirs and legal representatives, and all other persons claiming by, through or under them.

11. **SURVIVAL OF COMMITMENTS**: All representations, warranties, agreements to indemnify and covenants shall survive any partial performance or non-performance of this Agreement.

12. **APPLICABLE LAW**: This Agreement shall be governed by and construed according to the laws of the State or Commonwealth in which the Services are performed.

13. **TAXES**: Any and all sales tax, amusement tax or other tax imposed by local, state, provincial or federal government as a result of the performance of any Services rendered by LN in connection with this Agreement, shall be the responsibility of and paid for by Vendor at the time required by law (excepting any state or federal income tax imposed on LN).

14. **NO WAIVER OF RIGHTS**: If either party fails to enforce any of the provisions of this Agreement or any rights or fails to exercise any election provided in this Agreement, it will not be considered to be a waiver of those provisions, rights or elections or in any way affect the validity of this Agreement. The failure of either party to exercise any of these provisions, rights or elections will not preclude or prejudice such party from later enforcing or exercising the same or any other provision, right or election which it may have under this Agreement.

15. **INVALIDITY**: If any term, provision, covenant or condition of the Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated.

16. **CONFIDENTIALITY**: Except for disclosure (A) authorized by the express prior consent of LN, (B) Vendor's attorneys as may be necessary to allow for effective legal representation of Vendor's Interests; or (C) as required pursuant to any legal proceeding after prior written notice to LN, Vendor will never directly or indirectly, at any time during the Term, or at any time subsequent to the expiration or termination of this Agreement, for any reason, with or without cause, use, disseminate, disclose, divulge, or in any manner disclose or permit to be divulged or disclosed to any person, firm, corporation, association or other business entity business information, trade secrets, secret methods or other information. The aforementioned information shall include, but not be limited to, any and all

information about or relating to the methods, processes, customers, services or products of LN, its subsidiaries or other affiliated companies.

17. **NOTICES**: All notices given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally with receipt acknowledged or sent by registered or certified mail or equivalent, if available, return receipt requested, or by facsimile (which shall also be confirmed with a writing sent by registered or certified mail or equivalent on the same day that such facsimile is sent), or by nationally recognized overnight courier for next day delivery, addressed or sent to the parties at the addresses set forth herein with a copy to Live Nation Worldwide, Inc, 7060 Hollywood Blvd., Hollywood, California 90028, Attention: Senior Counsel, Legal Operations, North American Music.

18. **FORCE MAJEURE**: The failure of any party hereto to comply with the terms and conditions hereof because of a "Force Majeure Occurrence" shall not be deemed a breach of this Agreement. "Force Majeure Occurrence" shall be defined to include, without limitation, Act of God, strike, labor disputes, war, fire, earthquake, acts of public enemies, acts of terrorism, epidemic, action of federal, state or local governmental authorities or an event or reason beyond the reasonable control of a party. In the event of a cancellation of the Event due to a Force Majeure Occurrence, each party shall be relieved of its obligations hereunder with respect to the performance so prevented.

19. **DISPUTE RESOLUTION**: The Parties agree that, should any difference of interpretation, or any other controversy or claim arise out of or relate to this Agreement or any addendums or amendments hereto, or the breach hereof, the Parties shall immediately make good faith efforts to negotiate a written voluntary resolution of the matter prior to instigating legal proceedings. The Parties therefore agree that should a Party believe the other Party has breached this Agreement, the non-breaching Party shall provide the Party with written notice of such alleged breach and provide the Party with thirty (30) days from receipt of such notice to either (i) contest the allegation or (ii) cure the alleged breach prior to seeking legal recourse.

20. **EMPLOYMENT OBLIGATIONS**: LN is an equal opportunity employer and actively supports federal, state and local laws prohibiting discrimination in employment practices because of race, color, religion, veteran's status, sex, pregnancy and pregnancy related medical conditions, gender identity, marital status, national origin, ancestry, physical or mental disability, medical condition, age, sexual orientation, or any other classification protected by law. LN further complies with any and all other federal, state and local employment laws and regulations (including, but not limited to, those pertaining to family or medical leave and other fair employment practices). All of the foregoing is collectively referred to as the "Employment Obligations." LN requires that Vendor shall comply with the Employment Obligations with regard to Vendor's employees assigned to LN facilities or any of its subsidiaries or divisions, and Vendor agrees to comply with all applicable Employment Obligations as set forth herein.

21. **EXECUTION OF AGREEMENT**: This Agreement may be executed by facsimile signature and each Party may fully rely upon facsimile execution.

ACCEPTED and AGREED as of the date and year first above written.

**ESG SECURITY, INC.:**

By: _[signature]_

Print Name: Mike Rose

Title: President

Address: 1060 North Capitol, Suite E-210
Indianapolis, IN 46204

Phone / Fax: 317-261-0866 / 317-261-0955

Date: 3/11/13

**LIVE NATION WORLDWIDE, INC.:**

By: _[signature]_

Print Name: David Bartlett

Title: GM

Address: 625 S. Fourth Street
Louisville, KY 40202

Phone / Fax: 502.736.1303 / 502.583.9955

Date: 3.11.13

4

## EXHIBIT "A"
## SCOPE OF WORK

A.  Vendor agrees to provide crowd management services (collectively, "Services" unless specifically delineated otherwise) including event staff and security staff (collectively, "Service Personnel" unless specifically delineated otherwise) as requested by Live Nation for live Events at the Venue (including all pavilion area, plazas and parking lots, and streets adjacent thereto that are operated by LN). The services shall include (i) crowd control, peer security, and any other such functions hereunder as LN and Vendor may mutually agreed upon in writing, (ii) access control to the stage and backstage areas prior to, during and after the Events, as required by LN and pursuant to LN's instructions, (iii) Venue ingress and egress control and (iv) direction and control of the audience to deter any crowd disturbances.

B.  In the event that Vendor cannot provide the requested staffing number or the Services, Vendor will notify LN as soon as practicable, but in no event, no later than twelve (12) hours prior to the scheduled start time of the Event, and LN shall have the right to supplement the staffing number to the extent LN deems necessary in its sole discretion. LN shall not supplement staffing unless it has received such notification from Vendor's authorized manager.

C.  At all times immediately prior to, during and immediately after the Event, Vendor shall use best efforts to eject any person or persons attempting to start or in the process of starting and/or setting fires and/or inciting fire related behavior at the Venue. Furthermore, LN will aggressively pursue prosecution of any and all individuals caught in the act of starting or fueling a fire or participating in any fire starting behavior at the Venue.

D.  LN does not allow or condone moshing and/or body-surfing at the Venue. At all times immediately prior to, during and immediately after the Event, Vendor shall use best efforts to monitor, keep secure and maintain reasonable control over those individuals moshing and/or body-surfing in the general admission area located directly in front of the stage and/or in front of a staffed barricade. LN and Vendor shall, consistent with past practices between the Parties at the Venue, agree on the number of Service Personnel to be deployed for each Event based on the artist, the expected likelihood and levels of moshing and/or body-surfing. LN and Vendor will jointly develop a plan to control and reduce moshing and/or body-surfing as much as is reasonably possible. Furthermore, LN shall post visible and public notification to guests of this policy at the Venue.

E.  LN shall provide Vendor limited access to the venue's TMSS system in which ESG will schedule employees in advance and track employees' time on event days. LN will pay Vendor based upon the actual in and out records shown in TMSS.

F.  Vendor and LN shall mutually agree on the number and ratio of Supervisors to Event Guards.

G.  Prior to each event, LN and Vendor will meet to review these Scope of Work items A through F, and discuss any additional processes or procedures to be performance for each specific event. LN and Vendor, upon mutual agreement, may designate material additions or changes to the Scope of Work, which shall be confirmed in writing and signed by authorized representatives of the Parties.

H.  Vendor agrees to furnish trained, personable, well groomed and properly uniformed personnel as are reasonably and timely requested by LN, and agreed upon by Vendor. LN reserves the right to reject any personnel provided by Vendor for any reason. Vendor agrees that all of Vendor' personnel will conform to all codes of conduct, including, but not limited to, grooming, dress, parking and off-duty use of the Louisville Palace. Vendor agrees that its personnel will act, both now and in the future, in the best interest of LN.

I.  Vendor warrants and represents that all personnel scheduled under the terms of this Agreement, who will be performing guard or security functions will be properly registered in accordance with regulations then in effect, or as amended from time to time, and will have valid registration cards. LN understands that ushers, ticket takers, or similar unregulated positions may not be required to be registered.

J.  All of Vendor' personnel will report directly to Vendor' supervisors, who in turn will be responsible for the supervision of all their personnel. Any request by LN regarding the placement or conduct of Vendor' employees shall be made to Vendor' supervisor, who will be responsible for the satisfaction of such requests to the extent that they are not inconsistent with this Agreement.

K.  Vendor warrants that all personnel furnished hereunder will be free of felony convictions. Personnel supplied by Vendor shall not consume alcoholic beverages or be under the influence of any illicit drugs while on the premises of the Louisville Palace. Vendor agrees that certain locations at the Roseland are more sensitive, and therefore, requires continuity of personnel at such locations. Vendor agrees that it will make best efforts to make available a continuity of personnel in those locations.

L. LN retains the right, solely at LN's discretion, to direct Vendor to remove any of its personnel from the Louisville Palace, and to refuse to permit those individuals to return to work at future Events. LN agrees to give Vendor as much advance notice as possible, and allow Vendor time to schedule appropriate replacements.

# EXHIBIT "B"
## FEES

In consideration of the Services to be performed and the rights granted herein at the following Venue, LN shall pay to Vendor the following fees:

<u>The Louisville Palace</u>

Event Ushers/Ticket Takers:

Event Guards:

Supervisors:



The fees noted above shall be collectively renegotiated between **ESG Security, Inc.** ("Vendor") and the places of public gathering known as the **Murat Center** and the **Louisville Palace** ("Venues"), effective January 1, 2014.

Employees working on Thanksgiving Day, Christmas Day, and New Years Eve shall be paid one and a half (1.5) times the regular hourly rate.